Approximately three weeks ago, a district judge in San Jose issued, overturned his previous denial of, his previous dismissal of an injunction of a very similar  type of medical marijuana dispensary to the one that was tangentially involved with Brian Epis, and that was the case of Santa Cruz v. Ashcroft. I submitted a notice of supplemental authorities. In that case, the court followed Raich v. Ashcroft and took it two steps beyond. And first, finding that collectives are also within the meaning of Raich in that people can, patients who are, have doctor's recommendations to grow and use medical marijuana can band together and grow marijuana together for their personal medical use or the medical use of other patients within their collective. That's what Brian Epis was doing with four other patients in his basement. Could the jury hear evidence that his plan was, from which the jury could have inferred that Mr. Epis' plan was to sell excess? Your Honor, the, well, it has, I don't understand your question. Answer the question, yes. There was actually a document, two documents, Government Exhibits 27 and 38, which were excerpts from a proposal for a nonprofit dispensary in Silicon Valley that was never executed that the government took out of context. That was one of the other issues in the case. The question was, was there evidence before the jury from which a reasonable jury could have inferred that the client intended to sell for a profit excess-grown marijuana? No, Your Honor. Not without the jump that was made by using those exhibits out of context. And you understand that among the rules that we have to abide by here as an appellate court is we must take the facts in light most favorable to the prevailing party, in this case the government. I understand that, Your Honor. Without a doubt about a fact, we have to resolve that doubt in favor of the government. I understand, Your Honor, but the two government exhibits that you would have to rely on to make that jump came out of a proposal that the government knew was a proposal for a dispensary in Silicon Valley. It had names of people in it that had nothing to do with this grow. It had preposterous figures. When you look at those two exhibits, you can see they're preposterous. They couldn't possibly be right because they multiply ten times in one week or two weeks in the first month, and then they double every month thereafter. You were able to argue this to the jury, weren't you? Your Honor, actually ---- What you've just argued, you were able to argue this to the jury, weren't you? My client's previous attorney was able to argue that, but he was not allowed to put in the entire document or to question my client on the stand about the entire document that those excerpts came from, which would have explained the context. So that's our Rule 106 issue, which is also in that. The problem with the facts in this case, Your Honor, is that the prosecutorial misconduct in this case injected some untruth into this case that is the key so-called evidence of the government, and it falls apart when you see what it really is. And, Counsel, all of this argument goes to what? The question as to whether Mr. Eppes's conduct can be reached under the Commerce Clause? Is that what all of this goes to? Correct, Your Honor. Correct. Now, under Raich, Brian Eppes, in my opinion, from reading Raich, all of the conduct that was actually proven about what Brian Eppes did at trial was within what was permitted under Raich. Mr. Eppes was dealing with three other people. Four. Four other people. So there were five of them in total dealing in his home. They were growing marijuana together in the basement of his home. They were sharing the work and the product. And was any of that product going outside of those five people? Only a very small portion, which I believe is about 6 percent, went to the Chico Cannabis Caregivers Group. Now, they, in turn, accepted voluntary contributions like the WAM group in Santa Cruz. And if people couldn't afford it, it was given away. And the testimony at trial repeatedly was that there was no net benefit. So they were selling it to people who were in the Chico Cooperative? The Eppes was not. The Chico Cooperative, where Eppes and his group gave the excess, was accepting voluntary contributions. I think of something like $10, but it was totally in the evidence. We don't know what percentage of it was given away. It's not in the record. But the excess that they were giving to the Chico facility, they were donating to the Chico facility. They were not receiving payment for that? They were supposed to be reimbursed for some of their expenses. The evidence that came out at trial showed that that never actually occurred. So the money that was changing hands was not changing hands with Brian Eppes and the people inside his growing room. In the basement of his house. So because of those, they are just like the John Doe's. He is just like the John Doe's in the Raich case. Did the jury in this case find that Mr. Eppes was growing, cultivating marijuana for other than medical purposes? No, Your Honor. That was not put to the jury. The jury was given an instruction actually repeatedly that medical marijuana is not a defense, even though the court let Mr. Wong cross-examine the defense witnesses in detail about medical marijuana. They were repeatedly instructed. So there was absolutely no way the jury, without violating their instructions, could have found that any part of this was either it was or was not medical marijuana. That's why a new trial is required. That fact finding was kept from the jury. And there's no determination whatsoever of the facts having to do with this Raich defense. Ms. Granlin, I haven't had a chance to study the Santa Cruz case very carefully, but in browsing through it this morning, I don't see it cites the Perron case, which comes out of California. And you're undoubtedly familiar with the Perron case, aren't you? The state case? Yes. Yes, Your Honor. There, it seems to me that they say it doesn't make any difference whether these sales produced a profit or not. They reversed the district court. I'm sorry. I didn't hear. It doesn't make any difference. In the Perron case, they held that the fact that the sales outside those that cultivated it did not produce a profit was immaterial, that it was still a violation, notwithstanding Proposition 215. It was still a violation of the act. And on that basis, they really hold that any kind of contribution outside of the use that the people have themselves is a violation of the code. Isn't that your understanding of Perron? Actually, I haven't read it recently, Your Honor, but the Perron case was one appellate decision of one division of the state court system. The legislature has amended the statute, though, and the new statute is cited in my brief. It's contrary to the Perron case? Actually, I haven't compared it, but I believe they can be reimbursed. And I think there are other cases saying that they can be reimbursed under state law. Well, I'd have to read the statute, but it just seemed to me that Perron is much different than the Roch case. In the Roch case, there was a small group of people that were growing it only for their use, and it wasn't going outside their home. And, of course, Judge Ferguson held that that was a violation of the Commerce Clause. But here, Epsos is growing, what is it, a thousand plants? No, Your Honor, he was convicted of a conspiracy to grow a thousand plants based partially on the government's exhibits, which were taken out of context from that proposal for a non-profit. There were only 458 plants seized, and in the government's case in chief, they weren't able to, all they were able to do was speculate as to what he grew before that. And during the defense case, there was trial testimony that there were 11 to 15 prior harvests of 18 plants each. So that comes to between about 200 to 270 plants. So it came to about 600, between 600 and 700 plants altogether over a period of time, and that's between the five medical marijuana patients with doctor's recommendations who were mostly using all of it without any exchange of money between each other except for their mutual paying of utility bills, for example. But it was being sold or distributed outside their home? Most of it was used by the five patients. About 6% of the crop was distributed through or was donated, basically, to the Chico Club because they were never actually reimbursed for the expenses. I would like to reserve the rest of my time if I could. I'd like to ask a few more questions. Judge Boddy has a couple more questions. And Judge Boddy has some questions. We'll adjust your time for rebuttal. Thank you. Ms. Granlin, is there any evidence in the record, either presented by the defense or by the government, as to what a medical user of marijuana would reasonably require on a day-to-day basis? And how does that figure compare with the number of plants being grown in this? There was not any evidence of that sort in the record because the court was supposedly keeping out all the medical marijuana evidence completely. It just came in during cross-examination. So our facts that are developed came in, basically, during cross-examination of defense witnesses. And that was not put in. According to the defense, in terms of the plants actually seized, how much marijuana could reasonably be harvested, give me a time period, a week, a month? I think they were harvesting 18 plants a week. These plants were about a foot tall. They produced, I think, about four to eight grams apiece. I forget. It's in the record. These are indoor hydroponic plants. They don't produce a lot. So the weekly harvest of 18 plants divided up to about three apiece, I guess. And I think that's why, when there were five patients, there was not any left over. But this was largely supplying their needs, so there was no need for them to go to any outside sources of marijuana in order to supply their medical needs. After our decision in Raich, what is your view as to what the government has to prove in order to show that there's a sufficient connection to interstate commerce to come within Congress's powers? I think they would have to show some interstate commerce connection, such as, you know, plants being sold across state lines. But that has not been the standard for a long, long time in this country, particularly since Wickard v. Filburn. I understand, but this is in a medical marijuana context. I think if you could show that the... Is this confined to agriculture? I'm sorry? Yes, I cited that said that... I cited in a recent supplemental authorities that said that purchasing equipment locally that was manufactured out of state is not enough, but you would have to have... If you had some sort of business that involved something that... An inventory that was from out of state, so if they had brought it in from out of state or out of the country, for example, that would have probably brought it under the Commerce Clause, in my opinion. And I think that as long as this is a... It would have to be a closed system like this one, where you are limiting the system of marijuana distribution in the non-criminal sense to medical marijuana patients that are authorized under state law. So they would have to basically disprove that this was an actual medical marijuana operation. And I think they could do that by showing, you know, outside sales or that sort of thing to non-patients by the person. Okay. Thank you. Okay. Thank you, counsel. We'll give you some time for rebuttal. We'll hear from the government at this time. Mr. Wong. Good morning. The police court. My name is Samuel Wong. I'm an assistant United States attorney from Sacramento. I was the trial attorney in this case, and I can represent to the court that Ms. Grantland has made a number of misstatements of fact, a number of misstatements of law, and has falsely accused me of misconduct in this case. And the time allowed it to me to respond to her. I may not have enough time to respond to each one of her false allegations. And I just ask the court to respectfully look at the record as cited in my brief, and in cases of conflict, look at the citations to the record, and read the cases cited by the United States. And I'm confident that the court will determine that Ms. Grantland has overstated her case and has inaccurately stated her case. Mr. Wong, let me tell you what bothers me about your case here. You have convinced the jury and the court that this conspiracy involved the growing of 1,000 plants and 1,000 or more. And yet only 458 plants were seized. And as I understand your argument is that in the future, there is going to be great more cultivation along the same lines, and that's how you get up to 1,000. And that seems kind of tenuous to me. Well, Your Honor, the law of conspiracy is that once there is a plan to commit a crime, the making of the plan is the completion of the crime. In this case, the conspiracy was to manufacture at least 1,000 marijuana plants. That's on your projection. Well, there were plants that were manufactured in the past that were harvested. There were written notes by Mr. Eppes indicating that he had harvested plants for a number of weeks, 18 plants each week for a number of weeks prior to the time that we executed the search warrant on June 25th. As I understand the record, that goes from about 200 to 270. And that's on the basis of prior harvest. But that's still a long ways from 1,000. There were additional supplies and equipment at the marijuana grow operation that indicated that there was a plan to grow additional plants, and the total number of plants were going to exceed 1,000 marijuana plants. This issue was presented to the jury. Mr. Serra, who represented Mr. Eppes during trial, advocated that there was no such plan, that if there was a plan, it was a plan for five individual conspiracies for fewer than 100 marijuana plants apiece. The defense had an opportunity to present its evidence. The government presented its evidence. We had to prove beyond a reasonable doubt, that's a very, very high standard, that the plan involved more than 1,000 marijuana plants when the plan was created and agreed upon. The law of conspiracy is once the plan is agreed upon, the crime is complete. The failure of the participants in the conspiracy to reach the ultimate goal is immaterial to whether the crime was committed. I have a question about, do you have your red brief here? I have a copy of it, yes. Page one of the appellee's brief under the issues presented for review. Yes. And you state the issue this way. Whether the CSA, that's the Controlled Substance Act, is a proper exercise of Congress commercial cause authority when applied to the infrastate manufacture of marijuana plants primarily for commercial purposes. What's your factual basis for those last few words? Primarily for commercial purposes? Well, Your Honor, in this case we had a finding by the jury that the plan to manufacture marijuana plants involved more than, excuse me, at least 1,000 marijuana plants. That large number of marijuana plants. You found that there was a conspiracy to do that? Yes. That was a specific? I had thought that the fair reading of the proof at trial was that there was a marijuana grow and some of it was provided to people that had medical prescriptions, but the government was alleging that some of it, whether it was 5 percent, 10 percent, whatever, was distributed in some way that took this case outside of range. Was that your position or not? That's correct, Your Honor. Ethos testified on the stand and he claimed that he intended to sell marijuana grown in his home to the Chico Medical Marijuana Caregivers for $160 per ounce. He was going to charge the dispensary $160 per ounce, but that the patients would have to pay the dispensary close to $300 per ounce. This was a profit-making enterprise. What percent, according to the government, what percentage of the total actual grow was provided to Chico? I don't think there was anything in the record that we could put a finger on and say so much percent went to the Chico grow. The counsel said 6 percent. I submit to you, Your Honor, that she is inaccurate on that. However, if you, one of the court's questions was how much marijuana does a patient need? And what I would submit to you is to look at the California. Here's what I'm trying to get at before you're off on other subjects talking about it. What's your factual, good-faith factual basis for saying that this case involves a situation where the individual was cultivating marijuana primarily for commercial purposes? If you look at the exhibits that were involved in this case, Exhibit 26, there's a handwritten note by Mr. Eppes, and on that document, when he... Pardon? Did the jury find that his primary purpose was commercial? That was not a question presented to the jury. This was a pre-race case. However, if you look at that note, Exhibit 26, when Mr. Eppes referred to small amounts of marijuana, for instance, ounces, he would refer next to the ounce amount with a $300 figure. For instance, on that note, there was a reference to .65 ounces of marijuana, and he would put $200 next to it. If you look at Exhibit 27, which was his marketing plan, it showed that he was going to initially charge people approximately $300 per ounce. That was a $300 an ounce, which translates to approximately over $3,000 to almost $4,000 a year for each patient's supply of marijuana. And how much was actually sold? We don't know the exact amount that was sold, because no records were ever kept. Is that another way of saying there was no proof as to the actual amount sold? Well, Your Honor, there was testimony by Mr. Casico, who ran the Chico Cannabis Dispensary, that he did not... or made an accounting of the monies at all. Basically, the monies went into somebody's pockets. The Court asked earlier about how much marijuana does a person need for medical use. And I would submit that we can look at the California Legislature's determination. In 2003, which was a year after the jury convicted Mr. Eppes, the California Legislature passed a bill clarifying the law. It did not amend the law as claimed by Ms. Grantland. And in that law, the California Legislature set threshold amounts. Not ceilings, but just thresholds. The California Legislature said that if a doctor recommended more, the patient could use more. Or if the cities or municipalities wanted to give patients more, they could. But the threshold amounts for the patients, as determined by the California Legislature, and this is in the California Health and Safety Code section. If I just have a moment. Okay. I think it is in 11362.765. If it's not in 765, then it's... If a patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient, in addition, a qualified patient or primary caregiver may maintain no more than six mature or 12 immature marijuana plants per qualified patient. That's the determination by the California Legislature. The finding by the jury that there were going to be more than 1,000 marijuana plants involved in the conspiracy indicates that there had to be a commercial aspect to this operation. But if they were harvesting 18 a week... That was... In the past, they had actually surpassed that level by the time that we executed... But would 18 a week for five people, then, be within the California guidelines? That's what they're harvesting. I don't know whether... I think you used the word possession. I'm not sure whether that was a technical usage of that word or not. The legislature says maintain. That was the word that the legislature used. However... There were actually two weeks, 18 plants. And they were selling the plants. Mr. Kasichov admitted to selling some of the marijuana that was grown from the basement in Ephesus House. And he admitted to selling to a person on the streets. And this person was not even a person who had a recommendation from a doctor. Mr. Kasichov sold the marijuana just because he wanted to make the money. That was an admission by Mr. Kasichov. And he was one of these co-conspirators with Mr. Ephesus. Pardon? Can we talk about sentencing? I can answer whatever questions the Court has regarding sentencing. What's the government's position on the upward adjustment for a manager-supervisor? Mr. Ephesus deserved an aggravating enhancement in this case. He was the organizer and leader in this operation. The district court did not go that far and gave him a middle adjustment. Gave him an increase of only three levels. And found him to be a manager-supervisor of at least five persons involved. Mr. Ephesus hired Keith Dusick to hang the Mylar. He paid Keith Dusick to hang the Mylar. He also opined that Keith Dusick should have done other things like process the marijuana. How many people do you have to supervise to qualify for a guideline? Five. However, I believe my brief points out there were seven involved in this conspiracy. That he managed or supervised? Yes, in this case. Who were they? Keith Dusick, Kassikov. How did he supervise Kassikov? Kassikov was a novice when it came to growing marijuana. How did he supervise Kassikov? He instructed Mr. Kassikov how to grow marijuana. In fact, the law, Your Honor, is that the manager-supervisor only has to supervise one individual out of the group of five in order to get the enhancement. So the mere hiring of Keith Dusick and the payment to Keith Dusick, telling Keith Dusick to hang the Mylar, satisfies the sentencing guideline's requirement to get an aggravating role. Epis does not have to supervise everybody. There has to be at least five participants. There were seven. By Mr. Epis's own admission, he supervised Keith Dusick. So the aggravating role was properly given in this case. There is a proposition of law that this Court has reiterated a number of times, and that is, a defendant is entitled to an instruction on his defense unless the prosecution rebuts the defendant's evidence such that no rational jury could entertain a reasonable doubt as to the result of the asserted defense. In that case, the trial court's duty is to deny the requested defense instruction. This case came down before race ever was decided. And the law that I just cited to you can be derived from a case called United States v. Hoyt. That's 879 F. 2nd, 505-509, and it was amended later on other grounds. In that case, there was an entrapment instruction requested by the jury. Entrapment instruction requested by the defendant. The district court refused to give the entrapment instruction because no rational jury could entertain a reasonable doubt as to either element of the entrapment defense, predisposition or inducement. In this case, the race defense is only available to patients or primary caregivers under California law who manufacture or possess personal use amounts of medical marijuana. First of all, the fact that Mr. Eppes cannot qualify as a primary caregiver under California law, and Judge Lay is correct, that under People v. Perrone, and in another case, People v. Galambos, these collectives or dispensaries, whatever you want to call them, these cannabis clubs cannot qualify as primary caregivers because they do not consistently assume the primary responsibility for housing, safety, and care of the patient. Thank you for your argument, counsel. We'll hear a rebuttal argument at this time. Ms. Granlund, where did you find the 6 percent? You argued that, but is there something in the record to that effect? Right after Rach was handed down, I prepared a bail motion in which I went through the record and worked out mathematically, with the facts that were put in the record, what the facts showed, and that's how I came out with 6 percent. It's rough, because the evidence, as I said, was only what slipped in or what was brought out by Mr. Wong. I just want to quickly address some of the things that Mr. Wong said. First of all, on page 10 of my reply brief, we cite the two California Health and Safety Code sections that say that dispensaries are okay and that remuneration is permitted for expenses, not for profit-making, but for... First of all, additional supplies don't prove they intended to grow for 1,000 plants. Whenever you buy something in bulk, you don't know how much you're going to use. There is no way of knowing whether this was just extra that they happened to buy. Secondly, the marketing plan, which Mr. Wong is continuing to refer to, is one of the excerpts from that Silicon Valley plan that we've shown was improperly introduced at all. Mr. Wong's claim that Ethos said he intended to sell to Chico for $160 an ounce, I don't know. He didn't cite where in the record he found that, but I don't believe that's correct. And Mr. Wong's characterization of Mr. Kasichoff's testimony, I believe, is incorrect. As I recall, and you can see, I've cited it in my brief, and you can find where in the record he testified, Mr. Kasichoff did admit on cross-examination that he sold one time to someone who not yet had a doctor recommendation, and that he did that because the person was in medical need, and he said, go get a recommendation before I sell you any more. There was no evidence, first of all, that that was marijuana from the Ethos basement, as I recall, but the record will speak for itself. You need to wind up if you can. Okay. And as far as the California legislature, even though that new law was a clarifying law, according to the legislature, and it said what the law was intended to be, Mr. Ethos was arrested approximately four months after Proposition 215 was passed. I don't believe there were any cases in state court, even the Peron case still hadn't happened yet. Nobody knew exactly what the law would be as to the fine-tuning of the regulations. Thank you. Thank you, counsel, for your argument. Thank both counsel for the arguments. The case just argued will be submitted for decision, and the Court will stand recess until then. Thank you. Thank you.
judges: Lay, Hawkins, Bybee